1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10  CLIFFORD ABREU,

11             Plaintiff,                 No.  2:10-cv-1621 JAM CKD P

12       vs.

13  MATTHEW L. CATE, et al.,

14             Defendants.              FINDINGS AND

15                                       RECOMMENDATIONS

16  _____/

17             Plaintiff, an inmate in custody of the California Department of Corrections and

18  Rehabilitation ("CDCR"), proceeds pro se with a civil rights complaint filed pursuant to 41

19  U.S.C. § 1983.  (Dkt. No. 1.)  Defendants have moved for summary judgment.  (Dkt. No. 54, 55).

20  Plaintiff opposes the motion.  (Dkt. Nos. 57, 58, 60.)  Defendants did not file a reply.

21             Plaintiff alleges in his complaint that on January 7, 2008, defendants Miranda,

22  Davis and Robinson arrived at Doctors Medical Center in Modesto to transport him back to Mule

23  Creek State Prison (MCSP) three days after plaintiff's spinal surgery.  (Dkt. No. 1 at 6.[1])  The

24  non-handicap van used for transport was not fit to transport a medical patient in plaintiff's

25  _____

26       [1] The court references the page numbers assigned by the court's CM/ECF system to
    plaintiff's complaint.

1

condition, and it was too soon for him to be transported, causing him to suffer pain and further

injury during the transport.  (Id. at 9-11.)  Plaintiff claims that defendants Martel, Subia,

Williams, and Smith were responsible for setting the policies and procedures governing medical

transports and that it was their personal decision to determine how plaintiff was transported, and

that defendant Cate knew or should have known of the unreasonable risk of harm posed to

plaintiff when he approved the procedure used and failed to supervise, discipline and train the

staff responsible for plaintiff's pain and injury.  (Id. at 9.)

Plaintiff proceeds with claims for damages under the Eighth Amendment and

under the Americans with Disabilities Act ("ADA") against defendants Miranda, Davis,

Robinson, Martel, Subia, Williams, Smith and Cate.  (ECF No. 9 at 3-4.)

Defendants assert in their motion for summary judgment that plaintiff's Eighth

Amendment claims fail because he cannot show that prison officials denied, delayed, or

otherwise interfered with his access to medical care, cannot show that there are customs or

policies in place for transporting inmates in a way designed to inflict unreasonable and

unnecessary pain and suffering, and cannot show that defendants failed to properly train the

transport officers.  Defendants further argue plaintiff's ADA claim fails because he has not

shown that he is a qualified individual under the ADA.  Defendants further assert they are

entitled to qualified immunity.  (Dkt. No. 54 at 3.)

On November 20, 2012, contemporaneously with defendants' motion for

summary judgment, plaintiff was advised of the requirements for opposing a motion pursuant to

Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 56.)  See Rand v. Rowland, 154 F.3d

952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); Woods v. Carey, 684

F.3d 934 (9th Cir. 2012).

Summary Judgment Standards

Summary judgment is appropriate when it is demonstrated that there "is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

1    Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion

2    by "citing to particular parts of materials in the record, including depositions, documents,

3    electronically stored information, affidavits or declarations, stipulations (including those made

4    for purposes of the motion only), admissions, interrogatory answers, or other materials...."  Fed.

5    R. Civ. P. 56(c)(1)(A).

6            Summary judgment should be entered, after adequate time for discovery and upon

7    motion, against a party who fails to make a showing sufficient to establish the existence of an

8    element essential to that party's case, and on which that party will bear the burden of proof at

9    trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "[A] complete failure of proof

10   concerning an essential element of the nonmoving party's case necessarily renders all other facts

11   immaterial."  Id.

12           If the moving party meets its initial responsibility, the burden then shifts to the

13   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

14   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

15   establish the existence of this factual dispute, the opposing party may not rely upon the

16   allegations or denials of their pleadings but is required to tender evidence of specific facts in the

17   form of affidavits, and/or admissible discovery material, in support of its contention that the

18   dispute exists or show that the materials cited by the movant do not establish the absence of a

19   genuine dispute.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing

20   party must demonstrate that the fact in contention is material, i.e., a fact that might affect the

21   outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

22   248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

23   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

24   return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

25   1436 (9th Cir. 1987).

26   /////

1          In the endeavor to establish the existence of a factual dispute, the opposing party

2    need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

3    claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

4    versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

5    judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

6    genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

7    committee's note on 1963 amendments).

8          In resolving the summary judgment motion, the evidence of the opposing party is

9    to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn

10   from the facts placed before the court must be drawn in favor of the opposing party.  See

11   Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the

12   opposing party's obligation to produce a factual predicate from which the inference may be

13   drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

14   aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

15   party "must do more than simply show that there is some metaphysical doubt as to the material

16   facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the

17   nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation

18   omitted).

19                    Applicable Eighth Amendment Standards

20         "[T]he unnecessary and wanton infliction of pain constitutes cruel and unusual

21   punishment forbidden by the Eighth Amendment."  Whitely v. Albers, 475 U.S. 312, 319 (1986).

22   The Eighth Amendment's prohibition on cruel and unusual punishment imposes on prison

23   officials, among other things, a duty to "take reasonable measures to guarantee the safety of the

24   inmates."  Farmer v. Brennan, 511 U.S. 825, 832 (1991) (quoting Hudson v. Palmer, 468 U.S.

25   517, 526-27 (1984)).  "[T]he appropriate inquiry when an inmate alleges that prison officials

26   failed to attend to serious medical needs is whether the officials exhibited 'deliberate

4

1   indifference.'" Hudson v. McMillian, 503 U.S. 1, 5 (1992) (citing Estelle v. Gamble, 429 U.S.

2   97, 104 (1976)). "Such indifference may be manifested in two ways.  It may appear when prison

3   officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the

4   way in which prison physicians provide medical care."  Hutchinson v. United States, 838 F.2d

5   390, 394 (9th Cir. 1988); see also Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) ("Prison

6   officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay,

7   or intentionally interfere with medical treatment." (internal quotations omitted)).

8           In order to be liable, an official must know of and disregard an excessive risk to

9   inmate health or safety.  Farmer, 511 U.S. at 832.  Two requirements must be met: (1) the

10   deprivation must be, objectively, sufficiently serious; and (2) the prison official must be,

11   subjectively, deliberately indifferent to inmate health or safety.  Id. at 834.  A medical need is

12   serious if "the failure to treat a prisoner's condition could result in further significant injury or

13   the 'unnecessary and wanton infliction of pain.'"  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th

14   Cir. 1992), overruled on other grounds by WMX Technologies, Inc., v. Miller, 104 F.3d 1133

15   (9th Cir. 1997) (quoting Estelle, 429 U.S. at 104).  In order to be deliberately indifferent, the

16   official must both be aware of facts from which the inference could be drawn that a substantial

17   risk of serious harm exists, and must also draw the inference.  See Farmer, 511 U.S. at 834; see

18   also Toquchi v. Chung, 391 F.3d 1051, 1057-58 (9th Cir. 2004).

19           "While... deliberate indifference entails something more than mere negligence, the

20   cases are also clear that it is satisfied by something less than acts or omissions for the very

21   purpose of causing harm or with knowledge that harm will result."  Farmer, 511 U.S. at 836; see

22   also Toquchi, 391 F.3d at 1056 (holding that a prison official acts with deliberate indifference

23   only if he knows of and disregards and excessive risk to the prisoner's health and safety).

24   Substantial harm need not have resulted.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) ("A

25   prisoner need not show his harm was substantial; however, such would provide additional

26   support for the inmate's claim that the defendant was deliberately indifferent to his needs.").

1   When a prisoner alleges that delay of medical treatment constitutes deliberate indifference,

2   however, the prisoner must show that the delay caused harm and that and defendant should have

3   known this to be the case.  Hallett, 296 F.3d at 745-46; see also Shapley v. Nev. Bd. of State

4   Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (holding that mere delay of medical

5   treatment, without more, is insufficient to state a claim of medical deliberate indifference).

6                    Undisputed Facts

7                    For purposes of resolving this motion, the following facts are either undisputed by

8   the parties, or, upon review of the evidence submitted, have been deemed undisputed.

9                    At all times relevant to this action, plaintiff was a state prisoner in CDCR's

10   custody housed at MCSP.  (Defendant's Undisputed Fact ("DUF") 1.)  Plaintiff has an escape

11   history, which is documented on his classification chronos as an escape from work furlough in

12   February 1988.  (DUF 2.)  At all times relevant, defendants were employed by CDCR in the

13   following capacities: M. Cate was the Secretary of the CDCR; M. Martel and R. Subia were

14   Wardens at MCSP; B. Williams was the Health Care Manager at MCSP; C. Smith was the Chief

15   Medical Officer at MCSP; T. Miranda, M. Robinson, and P. Davis were Correctional/

16   Transportation Officers working out of MCSP.  (DUF 3.)

17                    On November 5, 2007, plaintiff was transported to Pacific Regional Neurosurgery

18   for a consultation with Dr. Remington.  (DUF 4.)  Plaintiff had a history of low back and right

19   leg pain that had been bothering him for about a year and a half.  (Id.)  Plaintiff described the

20   pain as "constant throbbing" with occasional shooting pain down the right leg to the outside of

21   his foot.  (Id.)  Dr. Remington discussed with plaintiff the ramifications of steroid injections

22   versus surgery and plaintiff elected to have surgery.  (Id.)

23                    On January 2, 2008, plaintiff was transported to the McHenry Medical Group in

24   Modesto for a preoperative examination, and the following day, on to Doctor's Medical Center

25   for surgery.  (DUF 5.)  Dr. Remington again discussed with plaintiff the surgery, the risks

26   associated with surgery, and other treatment options.  (DUF 6.)  It was Dr. Remington's opinion

1   that plaintiff would benefit from the surgery.  (Def. Ex. B, p.8.)  Plaintiff indicated that he

2   understood the risks associated with the surgery, and opted to proceed in spite of the risks.  (DUF

3   6.)

4            Dr. Remington performed the surgery, placing transpedicular screws at the L4 and

5   L5 levels.  (DUF 7.)  Plaintiff tolerated the procedure well and there were no complications.  (Id.)

6            Plaintiff was discharged from Doctor's Medical Center on January 7, 2008.  (DUF

7   11.)  Plaintiff requested to be released with a front wheel walker (FWW) and additional pain

8   medication.  (Id.)  A physician's assistant issued an order for Dilaudid, a potent Schedule II

9   opiate analgesic, for pain for the trip back with instructions to "Please give prior to transport[.]".

10  (DUF 12.)

11           Plaintiff's discharge orders stated that he was to keep the incision clean and dry

12  from sweat and water, towel dry after shower, and not to scrub the incision.  (DUF 13.)  The

13  discharge orders further stated plaintiff was not to twist, bend, lift more than ten pounds, or sit

14  more than ten minutes at a time, and he was to take short walks several times a day.  (Id.)  The

15  discharge orders did not explicitly state whether they were applicable for plaintiff's transport

16  back to MCSP, which took approximately an hour.  (Def. Ex. B p. 20-22; Plaintiff's Disputable

17  Fact ("PDF") 36.)  Plaintiff's discharge summary noted that he was being discharged in a

18  wheelchair, and not on a gurney.  (Def. Ex. B p.22.)

19           When an inmate is released from a hospital, members of the CDCR transportation

20  team receive a "hospital kit," including a copy of the inmate's discharge orders.  (DUF 16.)  The

21  transportation team also receives all pertinent information from on duty medical staff.  (Id.)  A

22  transportation officer's duties include checking and inspecting the vehicles, checking paperwork

23  for the inmate being transported, searching inmates prior to transportation, ensuring that the

24  inmate is properly seated in the transport vehicle, placing and checking restraints on each inmate,

25  and ensuring that the inmate is secured in the transport vehicle with a seat belt.  (Def. Ex. C, p.1.)

26  /////

1    Proper restraint equipment must be used during medical transport unless the

2 inmate's physical condition precludes the use of restraints.  (DUF 17.)  Such an exemption must

3 be authorized by the institution's Health Care Manager (HCM) and a concurrence must be

4 obtained from the correctional captain or watch commander.  (Id.)  There were no exemptions for

5 plaintiff's transport back to MCSP.  (Id.)  In addition, because plaintiff has a history of escape, he

6 was deemed a "high risk" inmate and was restrained in a manner appropriate to his risk level

7 during the transport.  (DUF 18.)  This included the use of "Black Box" restraints.  (PDF 11.)

8    The transportation team for plaintiff's transport back to MCSP consisted of

9 transportation officers Miranda, Robinson and Davis.  (DUF 15.)  Miranda and Robinson were in

10 the transport van during the ride back to MCSP and Davis was in the escort vehicle.  (Id.)  Before

11 leaving the hospital, the transportation team received a copy of plaintiff's discharge orders.

12 (DUF 19.)  The transportation team assisted plaintiff into the van by the side door and into a

13 seated position on a bench seat.  (DUF 20; PDF 11.)

14    The transportation took approximately an hour.  (PDF 36.)  Two other inmates

15 were present in the van.  (PDF 9.)  At one point, plaintiff advised the transportation officers that

16 he was nauseous, and they pulled over to the side of the road, stopped the van, and gave him a

17 sick bag.  (DUF 22.)  When the transport arrived at MCSP, medical staff assisted in removing

18 plaintiff from the van.  (DUF 24.)  Plaintiff was then helped into a wheelchair and taken to the

19 triage and treatment area, as per procedure.  (DUF 25.)  Upon removing his shirt, plaintiff saw

20 that his shirt was soaked with bodily fluids and blood that leaked from the sutures in his back.

21 (PDF 18.)

22    Plaintiff had several follow-up appointments with Dr. Remington.  (DUF 25.)  On

23 February 11, 2008, plaintiff was seen for his first follow-up appointment by Dr. Remington, who

24 dictated subsequent to the appointment that plaintiff had a "rough postoperative course," that he

25 "was sent home too soon," and that he "stayed in a wheelchair probably for too long" after

26 surgery.  (Def. Ex. B, p.23.)

1    After a second follow-up appointment on April 7, 2008, Dr. Remington dictated

2  that plaintiff had told him that he fell off the seat during the transport back to MCSP.  (DUF 27.)

3  Plaintiff was not feeling pain as often as he was before the surgery, but his recovery was slow.

4  (Id.)  Dr. Remington was optimistic that plaintiff would get better with time.  (Id.)  Dr.

5  Remington did not express an opinion as to whether the transportation procedures used interfered

6  with plaintiff's recovery.  (Def. Ex. B p.25.)

7    Following a third visit on August 13, 2008, Dr. Remington dictated:

8    The patient feels that his right leg is still weak.  His right leg pain
     is 50 percent better than his preoperative symptoms.  His
9    preoperative low back pain is a little bit better.  He does feel that
     the surgery was worth it and helped. [¶] [....] He does feel a
10   significant different [*sic*] at the point of surgery but laterally on his
     back he has pain and cannot seem to bend.

11

12  (Def. Ex. B. p.26.)

13    Following a fourth postoperative visit on December 15, 2008, Dr. Remington

14  dictated that plaintiff was having "severe pain" into his tail bone and into the butt cheek and is

15  "suffering so bad, he would consider a second surgery."  (Def. Ex B p.27.)

16    Plaintiff's expert, James E. Daly, D.O, M.S., is a retired Doctor of Osteopathy and

17  Master of Science.  (Plaintiff's Disputable Facts ("PDF") 39.)  Dr. Daly states of plaintiff's status

18  as of March 3, 2012:

19    Mr. Abreu... presents himself with severe back pain that level of
     10/10 radiated down his right leg and into right foot to include first
20   toe.  The pain is less severe on the left hip and leg, but follow the
     same pattern.  Mr. Abreu also complains of progressive weakness
21   in both legs with the right more prominent than the left. He states
     that walking using a walker has become more difficult due to
22   progressive lower extremity weakness especially in the right leg.
     Of concern is the loss of strength and muscle mass of the right
23   Gastrocnemius which has resulted in difficulty the planter flex the
     right foot and knee [*sic*]. These progressive difficulties have
24   resulted in swaggering gate even with walker for stabilization. [¶]
     The level of back and bilateral leg pain varies from six out of ten
25   on good days, and from seven to nine on bad days depending on
     the distance he is forced to walk.  He is capable of walking twenty-
26   five yards before the pain and fatigue requires him to stop and rest

9

1   for five minutes.

2   (PDF 40, 41.)

3   Dr. Daly states that the lumbar operation plaintiff underwent entails a very

4   extensive procedure and requires careful rehabilitation.  (PDF 45.)  The use of Dynasis screws to

5   attach the body of the vertebra to each other require some six weeks to become ossified to the

6   bone; during that period of time the duration and extent of activities are restricted.  (Id.)  Dr. Daly

7   states it was imperative that Dr. Remington's post-surgical orders, including that plaintiff not sit

8   for more than ten minutes at a time, be explicitly followed after plaintiff's back surgery and that

9   it was imperative that plaintiff be transported in a manner in which he could remain supine,

10  rather than seated upright.  (PDF 49.)

11  After thorough review of the records and plaintiff's present medical presentation,

12  it is Daly's opinion that plaintiff's "present failed back syndrome, with atrophic muscular

13  neuropathy extensively in the right hip, lower leg and foot," and to a lesser extent involvement of

14  his left side, "resulted from unsecured sitting position while in transit for forty-five minutes to

15  one hour while in transit from Doctor's Hospital to Mule Creek State Prison."  (PDF 39, 57.)

16  Disputed Facts

17  The main dispute in this case is whether the manner of plaintiff's transport back to

18  MCSP interfered with his recovery.  In particular, the parties dispute whether plaintiff's

19  discharge orders, which indicated that he was being discharged in a wheelchair rather than a

20  gurney, but also ordered that he not sit for more than 10 minutes at a time, meant that he must be

21  transported in a supine position rather than a seated position.  (DUF 19; PDF 46-49.)  The parties

22  dispute whether the transport officers were unable to secure plaintiff with a seatbelt on the bench

23  seat in the van due to severe swelling of his back from the surgery.  (PDF 10, 34.)  The parties

24  dispute whether, during the transport, plaintiff slid or fell off the bench and lay twisted in a

25  trapped position between the cage wall and the seat.  (PDF 11.)  The parties dispute whether

26  plaintiff screamed out in pain asking for help, which defendants did not provide.  (PDF 11, 13,

35.)  The parties dispute whether plaintiff remained in the twisted, trapped position while the transportation team stopped the van to give him a sick bag, but did not right him, after which transport continued with plaintiff stuck in that position for the duration of the transport.  (PDF 11.)

<u>Analysis of the Motion as to Plaintiff's Eighth Amendment Claims</u>

As an initial matter, it is clear that plaintiff's post-surgical medical needs qualify as a serious medical need.  Citing plaintiff's deposition testimony, defendants argue, first, that plaintiff has "repudiated" his allegation in his complaint that he fell from the seat to the floor of the van during transport from the hospital to MCSP.  (ECF No. 54 at 7.)  Plaintiff testified in his deposition:

> ...I was half on and half off the seat. [¶]  I wasn't like completely on the floor of this van.  I was like – I was like this paper, like leaning half in (indicating) – I was stuck.  The lower part of the body was stuck like this in the van (indicating).  So all they could do they told me is give me a bag to throw up in.  And that's what they did, and they shut the van and kept going.

(Def. Ex. E [Pl. Depo, p. 50.])  Defendants' argument that plaintiff has repudiated his allegation is not persuasive as a factual dispute exists as to whether plaintiff slid off the bench seat into a twisted position during the transport and whether that occurred due to his not being restrained by a seat belt, possibly in combination with other factors.  Just a few days prior, plaintiff underwent a major surgery and was under doctor's orders not to twist, bend, lift more than ten pounds, or sit more than ten minutes at a time.  Plaintiff's hands were restrained and he was seated on a bench seat in the transport van.  He has submitted evidence in the form of his own sworn declaration and the sworn declaration of another inmate present that his seatbelt was not fastened by the transportation team due to swelling from the surgery, that he slid off the bench into a painful, twisted position, and that the transportation team left him there even upon stopping the van to give him a sick bag, for the remainder of the transport.

/////

1    The transportation team's duties included receiving a copy of the inmate's

2  discharge orders, ensuring that plaintiff was properly seated, and ensuring that plaintiff was

3  secured with a seat belt.  While the failure to secure an inmate with a seatbelt would not normally

4  show deliberate indifference standing alone, transporting a post-surgical inmate under orders not

5  to twist, bend, or sit for more than 10 minutes at a time on a bench seat unrestrained by a seatbelt

6  for an hour long transport could reasonably be said to be in disregard of a known and excessive

7  risk to the prisoner's health and safety, particularly in light of plaintiff's tendered evidence that

8  he fell off the seat into a twisted position in which he was left for the remainder of the transport

9  despite screaming out for help.  Under these circumstances, plaintiff has put forth evidence

10  sufficient to create a triable issue of fact as to whether these defendants were aware of facts from

11  which the inference could be drawn that a substantial risk of serious harm to his health or safety

12  existed and whether they drew the inference, yet failed to change the course of action.  Farmer,

13  511 U.S. at 834; see also Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir. 2003) ("Much

14  like recklessness in criminal law, deliberate indifference to medical needs may be shown by

15  circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually

16  knew of a risk of harm.").

17    Defendants argue that although plaintiff alleges that he was screaming in pain,

18  defendants Miranda and Robinson did not hear him scream and did not believe that plaintiff was

19  in acute distress.  (ECF No. 54 at 7.)  The court notes that Miranda has submitted a declaration to

20  this effect; Robinson has not.  Regardless, plaintiff's evidence creates a disputed issue of fact in

21  this regard.  As for Davis, the third member of the transportation team, defendants argue that he

22  was in the car following the van and never heard or saw plaintiff's complaints of pain.  (Id. at 8.)

23  While this is true, Davis was a member of the transportation team responsible for securing

24  plaintiff in the van, and Davis has not submitted a declaration indicating the extent of his

25  involvement and indicating whether he perceived a substantial risk of harm to plaintiff based on

26  the manner of transport.

1    Defendants next argue that plaintiff cannot show that the defendants' alleged

2  actions resulted in any harm.  (ECF No. 54 at 8.)  However, as set forth, plaintiff has submitted

3  evidence in the form of an opinion of Dr. James E. Daly., D.O., M.S., that plaintiff's "present

4  failed back syndrome, with atrophic muscular neuropathy extensively in the right hip, lower leg

5  and foot," and to a lesser extent involvement of his left side, "resulted from unsecured sitting

6  position while in transit for forty-five minutes to one hour while in transit from Doctor's Hospital

7  to Mule Creek State Prison.  For purposes of this motion, plaintiff's evidence in this regard is

8  essentially undisputed, as defendants contend only that Dr. Remington did not indicate that the

9  manner of transport caused plaintiff further injuries; in other words, Dr. Remington did not

10 express an opinion.  Plaintiff's evidence that substantial harm resulted provides additional

11 support for the his claim that defendants were deliberately indifferent to his needs.  Jett, 439 F.3d

12 at 1096.  A genuine dispute of material fact exists for trial.  For these reasons, defendants'

13 motion for summary judgment should be denied as to plaintiff's Eighth Amendment claims

14 against Miranda, Robinson and Davis, the three members of the transportation team.

15    Defendants next assert there is no evidence that Dr. Smith (Health Care Manager

16 at MCSP) or Dr. Williams (Chief Medical Officer at MCSP) interfered in any way with

17 plaintiff's treatment at the outside hospital, or that they were involved with the timing of his

18 release from the hospital, or that they had any involvement with the manner of his transportation

19 back to the prison.  (ECF No. 54 at 8.)  Defendants are correct that there is no evidence that

20 Smith or Williams had any involvement with plaintiff's treatment at the hospital or any

21 involvement in determining his release date from the hospital, as the undisputed evidence

22 indicates that Dr. Remington discharged plaintiff from the hospital, albeit "too soon" in his own

23 opinion.

24    As to transport, plaintiff has alleged that Williams and Smith were responsible for

25 setting the policies and procedures governing medical transports and that it was their personal

26 decision to determine how plaintiff was transported.  Plaintiff further contends that MCSP

1  refuses to utilize handicap accessible vehicles despite having been notified of the

2  unconstitutional conditions with medical/handicap transports and that MCSP systematically

3  subjects inmates to inhumane medical transport vehicles, restraints, and procedures.  (PDF 67-

4  69.)  As support, plaintiff cites to his Exhibit F, which he states is "a large multitude of inmate

5  declarations and Inmate Appeals [602] covering several [years] by inmate/patients; disabled

6  patients, mobility impaired inmates; and post-surgical [inmates] who all suffered wanton and

7  callous infliction of pain, injury due to medical transport vehicles, and restraints used by these

8  defendants."  (ECF No. 57 at 18.)

9          A recurring theme in the declarations and inmate appeals presented in plaintiff's

10  Exhibit F is the use of so-called "Marten cuffs" or "Black Box" hand restraints on medical

11  transports of elderly or disabled MCSP inmates and injuries allegedly sustained therefrom.  Many

12  of the declarants state that other prisons do not use these restraints and they believe that MCSP

13  uses them to discourage inmates from seeking outside medical treatment.  (See ECF No. 58 at

14  98-149, 58-1 at 1-9.)  Several declarants complain of pain, numbness, and other injuries to hands

15  and wrists caused by use of these restraints.  (Id.)  In this case, however, plaintiff did not suffer

16  hand or wrist injuries, but rather, alleges that the use of these restraints in combination with other

17  factors essentially left him in an unsafe position for transport causing him to slide off the bench

18  seat and sustain injuries.  Plaintiff presents only one inmate statement signed under penalty of

19  perjury complaining of a similar issue (see ECF No. 58 at 107 [use of Black Box cuffs renders

20  "hands and arms completely immobile" so that I have to use my lower back and legs to keep my

21  face and head from smacking up against the side of the steel cage]), and one additional inmate

22  statement not signed under penalty of perjury and therefore having no evidentiary value for

23  purposes of this motion (see ECF No. 58 at 100 ["I fell against the side [of the van] and I cut my

24  arm"]).  This evidence fails to show any involvement by defendant Williams or Smith in the

25  manner of plaintiff's transport on January 7, 2008.

26  /////

1    However, it is undisputed that an exemption from normal transportation

2  procedures would have to have been authorized by Smith.  Smith has not submitted a declaration

3  explaining why there were no exemptions for plaintiff's transport back to MCSP.  While a

4  perfectly valid explanation may exist, such evidence has not been tendered for purposes of this

5  motion.  With no evidence in the record on this point, and in light of plaintiff's currently

6  undisputed evidence that he suffered serious injuries from the manner of transport, there is a

7  genuine dispute of material fact for trial as to whether Smith knew of and disregarded an

8  excessive risk to plaintiff's health or safety in regard to the manner of plaintiff's transport from

9  the outside hospital to MCSP.

10    Defendants next assert that plaintiff has not stated a cognizable claim for failure to

11  properly train staff, or deliberate indifference in setting the policies and procedures governing

12  medical transports, by supervisory personnel defendants Williams, Smith, Cate (CDCR

13  Secretary), Subia (Warden) and Martel (Warden).  The undersigned agrees.

14    Supervisory personnel are generally not liable under § 1983 for the actions of their

15  employees under a theory of respondeat superior.  The Ninth Circuit has recently reaffirmed that

16  a supervisory defendant may be held liable under § 1983 only "'if there exists either (1) his or her

17  personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

18  between the supervisor's wrongful conduct and the constitutional violation.'" Starr v. Baca, 652

19  F.3d 1202, 1207 (9th Cir. 2011) (quoting Hansen v. Black, 885 F.2d 642, 646 (9th Cir.1989)).

20  To show that supervisory defendants have failed to train subordinates, a plaintiff must show (1)

21  "the need for more or different training was obvious;" and (2) the inadequacy of the training was

22  "so likely to result in violations of constitutional rights" that the supervisors can reasonably be

23  said to have been deliberately indifferent to the need.  Clement v. Gomez, 298 F.3d 898, 905 (9th

24  Cir. 2002) (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)).

25    Here, there is no evidence of deliberate indifference in the failure to train

26  employees by any of the named defendants who are supervisory personnel.  Nor is there any

15

1  evidence that any defendant other than Smith, Miranda, Robinson or Davis caused or participated

2  in the constitutional deprivation allegedly suffered by plaintiff.  See Taylor v. List, 880 F.2d

3  1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal

4  participation by the defendant."); Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988) ("The

5  inquiry into causation must be individualized and focus on the duties and responsibilities of each

6  individual defendant whose acts or omissions are alleged to have caused the constitutional

7  deprivation.").  Moreover, liability for an improper custom or policy may not be predicated on

8  isolated or sporadic incidents.  Hunter v. Cnty of Sacramento, 652 F.3d 1225, 1233 (9th Cir.

9  2011) (citing Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (internal citations omitted)).

10  Plaintiff's conclusory allegations that supervisory defendants were responsible for the

11  deprivations alleged based on their policies or failure to train subordinates are insufficient to

12  withstand summary judgment.  For these reasons, summary judgment should be entered in favor

13  of defendants Williams, Cate, Subia and Martel on plaintiff's Eighth Amendment claims.

14          Analysis of the Motion as to Plaintiff's ADA Claims

15          Title II of the ADA prohibits "discrimination on the basis of disability" by a

16  public entity.  Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002).  Title II of the ADA

17  provides that "no qualified individual with a disability shall, by reason of such disability, be

18  excluded from participation in or be denied the benefits of the services, programs, or activities of

19  a public entity, or be subject to discrimination by such entity."  42 U.S.C. § 12132.  Title II of the

20  ADA applies to inmates within state prisons.  Pennsylvania Dept. of Corrections v. Yeskey, 524

21  U.S. 206, 208 (1998); see also Armstrong v. Wilson, 124 F.3d 1019, 1023 (9th Cir. 1997); Duffy

22  v. Riveland, 98 F.3d 447, 453-56 (9th Cir. 1996).

23          "To establish a violation of Title II of the ADA, a plaintiff must show that (1) [he]

24  is a qualified individual with a disability; (2) [he] was excluded from participation in or

25  otherwise discriminated against with regard to a public entity's services, programs, or

26  activities[;] and (3) such exclusion or discrimination was by reason of [his] disability."  Lovell,

16

1   303 F.3d at 1052.

2          Here, plaintiff's allegations that he was improperly transported following his

3   surgery do not demonstrate or allow an inference that he was denied some benefit or service

4   based upon a disability.  The treatment or lack of treatment for a medical condition does not

5   provide a basis upon which to impose liability under the ADA.  Simmons v. Navajo County, 609

6   F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not

7   inadequate treatment for disability."); see also Burger v. Bloomberg, 418 F.3d 882, 883 (8th Cir.

8   2005) ("a lawsuit under the ... [ADA] cannot be based on medical treatment decisions"); Bryant

9   v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (The ADA is not "violated by a prison's simply

10  failing to attend to the medical needs of its disabled prisoners.").  In addition, plaintiff has not

11  sued a public entity as required by the statute.  See Alsbrook v. City of Maumelle, 184 F.3d 999,

12  1005 n.8 (8th Cir. 1999) (Public entity, "as it is defined within the statute, does not include

13  individuals.").  For all these reasons, plaintiff's claims under the ADA against the named

14  defendants are not cognizable.  Summary judgment should be entered in defendants' favor on

15  plaintiff's ADA claims.

16                    Qualified Immunity

17          Government officials performing discretionary functions generally are shielded

18  from liability for civil damages insofar as their conduct does not violate clearly established

19  statutory or constitutional rights of which a reasonable person would have known.  Harlow v.

20  Fitzgerald, 457 U.S. 800, 818 (1982).  In determining whether a governmental officer is immune

21  from suit based on the doctrine of qualified immunity, the court considers two questions.  The

22  first question asks whether the facts alleged, viewed in the light most favorable to the party

23  asserting the injury, comprise the violation of a constitutional right.  Saucier v. Katz, 533 U.S.

24  194, 201 (2001).  A negative answer ends the analysis, with qualified immunity protecting

25  defendant from liability.  Id.  If a constitutional violation occurred, the court further inquires

26  "whether the right was clearly established."  Id.  "If the law did not put the [defendant] on notice

1  that [his] conduct would be clearly unlawful, summary judgment based on qualified immunity is

2  appropriate." Id. at 202.

3  　　　　The inquiry into whether a right was clearly established "must be taken in light of

4  the specific context of the case, not as a broad general proposition." Id. at 201. "[T]he right the

5  official is alleged to have violated must have been 'clearly established' in a more particularized,

6  and hence more relevant, sense: The contours of the right must be sufficiently clear that a

7  reasonable official would understand that what he is doing violates that right." Anderson v.

8  Creighton, 483 U.S. 635, 640 (1987).  It is plaintiff's burden to show that the right at issue was

9  clearly established.  Alston v. Reed, 663 F.3d 1094, 1098 (9th Cir.2011).  A negative answer to

10  either question means immunity from suit is appropriate.  Pearson v. Callahan, 555 U.S. 223, 236

11  (2009).

12  　　　　The right to "have prison officials not be 'deliberately indifferent to serious

13  medical needs'" is a sufficiently particularized right for the purposes of the qualified immunity

14  analysis.  Kelley v. Borg, 60 F.3d 664, 666-67 (9th Cir. 1995) (citing Estelle v. Gamble, 429 U.S.

15  97, 106 (1976)).  While defendants Miranda, Robinson and Davis are non-medical prison

16  officials, it is clearly established that both medical and non-medical prison official can violate an

17  inmate's Eighth Amendment rights by interfering with prescribed medical treatment.  See

18  Hamilton v. Endell, 981 F.2d 1062, 1066 (9th Cir. 1992) ("Prison officials are deliberately

19  indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere

20  with medical treatment."); see also Estelle, 429 U.S. at 105.  It is also clearly established that an

21  Eighth Amendment violation can result from an official's failure to follow post-surgical

22  discharge instructions:

23  　　　　　　Following Estelle, we have held that a prison official acts with
　　　　　　deliberate indifference when he ignores the instructions of the
24  　　　　　　prisoner's treating physician or surgeon.  For example, in Hamilton
　　　　　　v. Endell, 981 F.2d 1062 (9th Cir. 1992), the defendant officials of
25  　　　　　　the Fairbanks Correctional Center transferred the plaintiff to an
　　　　　　Oklahoma prison via airplane despite the fact that Hamilton's
26  　　　　　　physician had instructed that, due to a chronic ear problem,

18

Hamilton "should ... not fly anywhere for about six months." <u>Id.</u> at 1064.  As a result of the flight, Hamilton alleged that he suffered severe damage to his ear.  We concluded that the case was "akin to cases finding deliberate indifference where prison officials and doctors deliberately ignore[ ] the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner." <u>Id.</u> at 1066-67 (citing <u>White v. Napoleon</u>, 897 F.2d 103, 106-10 (3rd Cir. 1990); <u>Martinez v. Mancusi</u>, 443 F.2d 921, 924 (2nd Cir. 1970)).

<u>Wakefield v. Thompson</u>, 177 F.3d 1160, 1165 (9th Cir. 1999).  These rights were clearly established at the time of the defendants' alleged deliberate indifference in 2008.  Accordingly, defendants' motion should be denied to the extent is it based on an assertion of qualified immunity.

In accordance with the above, IT IS HEREBY RECOMMENDED THAT defendant's motion for summary judgment (Dkt. No. 54) be granted in part and denied in part as follows: granted as to plaintiff's claims under the ADA; granted as to plaintiff's Eighth Amendment claims against defendants Williams, Cate, Subia and Martel; and denied as to plaintiff's Eighth Amendment claims against defendants Miranda, Robinson, Davis and Smith.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: July 1, 2013

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

8abre1621.57.MSJ

19